Plaintiffs' Exhibit No. 5

Condensed Transcript

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF SOUTH CAROLINA
FLORENCE DIVISION

CALVIN SETH ROLLENHAGEN
and SANDRA ROLLENHAGEN,

Plaintiffs,

vs.

INTERNATIONAL SPEEDWAY,
CORPORATION (ISC), NEWELL
RUBBERMAID, INC., SARA LEE
CORPORATION, DARLINGTON
RACEWAY OF SOUTH CAROLINA,
LLC, and THE PARK PROGRAMS,
LLC, jointly and severally,

Defendants.

Case No.
4:08-CV-
0311-TLW-TER

# DEPOSITION OF

## PAMELA WESSON

June 4, 2009
1:10 p.m.

230 NORTH ELM STREET
GREENSBORO, NC

Mark Rabinowitz, Court Reporter



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

**Page 21**

1. Lee to develop a written agreement between Park Programs
2. and Sara Lee, if you were selected to go to work?
3. A. That was our legal department that would have
4. done that.
5. Q. So when Mr. Kellogg made his presentation,
6. where was that? Do you remember?
7. A. At Sara Lee in Cincinnati.
8. Q. Did he come by himself, or did he have others
9. with him?
10. A. He came by himself.
11. Q. Do you remember what he brought with him?
12. A. He brought a PowerPoint.
13. Q. Was his presentation actually displayed on a
14. screen on the wall or whatever?
15. A. I don't remember.
16. Q. Did he bring with him any graphic materials at
17. all, other computer-generated drawings, or schematics
18. of any type with ideas?
19. A. I believe so.
20. Q. Do you know if he was asked to bring certain
21. things in particular with him?
22. A. I don't remember.
23. Q. You told us that you thought that Travis Green
24. and Karen Manring were the people who were responsible
25. in making the contact with Mr. Kellogg?

**Page 22**

1. A. Yes.
2. Q. You have told me, I think, that you don't know
3. how Mr. Kellogg ever came to them, correct?
4. A. Correct.
5. Q. So he showed up, and he had a PowerPoint, and
6. he had some materials. Do you have any specific
7. recollection of what he had there such that you would
8. be able to describe it in general terms for the record?
9. A. He had a PowerPoint that had a past promotion
10. that he had executed, I believe, at a campground. So he
11. was using that, his ability to do these types of events.
12. Q. He brought some work that he had done at a
13. campground?
14. A. I believe he had worked with a vendor. I think
15. it was a gas company. I can't recall the name of the gas
16. company, but it was a tie-in with a gas company and a
17. campground that he did events for.
18. Q. Do you recall photographs of his prior
19. experience at the campground being presented?
20. A. I don't recall.
21. Q. Whose responsibility was it ultimately to
22. actually hire and engage someone to take over, or direct
23. the interactive program at the racetrack?
24. A. Who actually approved it?
25. Q. Yes; who ultimately would have approved the

**Page 23**

1. person or the company that did it.
2. A. Deb Sabo and the Ballpark brand.
3. Q. You don't recall if Deb Sabo was at this first
4. presentation, correct?
5. A. I don't recall.
6. Q. So he brought a PowerPoint with him. He
7. brought some information that demonstrated to you that
8. his prior experience was at a campground. It may have
9. been for a gas company. Did he present to you whether
10. he had prior contacts, any earlier customers of his --
11. A. No --
12. Q. -- people that he worked for?
13. A. -- not to me, he did not.
14. Q. Do you know if he did for someone else?
15. A. I don't recall.
16. Q. About how long did this presentation take?
17. A. An hour.
18. Q. After this hour, what, if anything, was said
19. to Mr. Kellogg with regard to future dealings?
20. A. That I don't recall. Karen and Travis worked
21. with him.
22. Q. What was your next experience with Park
23. Programs or Mr. Kellogg after this presentation? By
24. that I mean not just you, personally, meeting with him
25. or talking with him, but knowledge or information that

**Page 24**

1. came to you about his potential involvement with the
2. company.
3. What did you next learn about the activities
4. between Sara Lee and Park Programs?
5. A. At that point Karen and Travis put together
6. some kind of, you know, document for Deb to review. They
7. all agreed that he was the one to use. Then after that
8. is when I was more involved in executing it.
9. Q. What was this document, if you know, that
10. Karen and Travis put together for Deb to look at?
11. A. I don't know what the exact document was.
12. It was just -- you know, it could be a PowerPoint or
13. something, but that's how they communicated what this
14. opportunity was.
15. Q. Were you ever told what Mr. Kellogg would be
16. doing for Sara Lee? That is, when I say "Mr. Kellogg,"
17. I mean Park Programs --
18. A. Uh-hum.
19. Q. -- before he actually appeared at the
20. racetrack, or before Park Programs' display or
21. experience was shared with the racetrack.
22. A. After it was agreed that he would be the
23. vendor, that we would use -- that Sara Lee would use --
24. Q. Excuse me once again. You didn't agree to
25. that?



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

Pamela Wesson                                                                                                                     June 4, 2009

25

```
 1    A. Right.
 2    Q. Deb Sabo did?
 3    A. Correct.
 4       After it was agreed that he was the one that
 5    Sara Lee would use, that's when I got more involved in
 6    terms of what the display area would look like, and how
 7    we would show the brand messaging, and the brand at that
 8    display area.
 9    Q. So I take it, then, some direction was given
10    to Mr. Kellogg about what Sara Lee was looking for and
11    what they wanted, correct?
12    A. Correct.
13    Q. Did he indicate that he would do as best as he
14    could to comply with Sara Lee's directives?
15       MR. COLE: Objection to the form of the
16    question.
17    Q. Do you understand my question?
18    A. (No response).
19    Q. Sara Lee gave him some information to work
20    with to see if he could do it, correct?
21    A. Yes.
22    Q. Was he able -- for the most part -- to come up
23    with the information -- or, excuse me, with a plan for
24    the ideas given by Sara Lee?
25    A. Yes.
```

26

```
 1    Q. Okay. Did you participate in providing to
 2    Mr. Kellogg -- when I say "Mr. Kellogg," I really mean
 3    Park Programs, that he was representative of. What
 4    types of things did you share with Mr. Kellogg that Sara
 5    Lee was looking for?
 6    A. Again, just wanting to make sure that the brand
 7    was prominent. That the tag lines that we used were
 8    accessible to the consumers that way in interactive
 9    display areas and things like that.
10    Q. Were specific directions given in that regard?
11    I mean, here is what we want the tag line to be, this is
12    how we want it done?
13    A. Yes, that came from Chiat/Day.
14    Q. The tag lines came from Chiat/Day?
15    A. Correct.
16    Q. But it was part of your job of making sure
17    that Mr. Kellogg actually displayed and used those tag
18    lines and the like?
19    A. Yes.
20    Q. There was a banner in this case. We have
21    learned that it was a banner longer than 20 feet or so
22    that had Ballpark Franks' literature and graphics on it.
23    Do you know whether that banner was something that was
24    given to Mr. Kellogg in terms of an idea that that would
25    be used?
```

27

```
 1    A. He came up with that idea.
 2    Q. Who actually presented this banner and
 3    prepared it? Do you know?
 4    A. I do not know.
 5    Q. We have seen a number of graphic-type
 6    presentations or depictions on eight-and-a-half by 11
 7    paper that I think were either retrieved from a program
 8    or some ideas. I think Deb Sabo referred to it as
 9    a "deck." Have you ever heard language like that, a
10    "deck"?
11    A. Yes.
12    Q. What is a "deck," to your understanding?
13    A. A PowerPoint.
14    Q. There were a number of -- it looks like
15    proposals -- that came from Mr. Kellogg for either
16    articles or equipment or deliverables, as they are
17    sometimes called, I think, to be used at the display.
18    He had made some proposals, which -- as we learned --
19    weren't the ultimate proposals. There were some changes
20    in that.
21       Did Sara Lee -- so far as you know --
22    participate in developing what ultimately would be used
23    in terms of the deliverables and equipment and the like?
24       MR. COLE: Objection to the form of the
25    question.
```

28

```
 1       You can answer, if you can.
 2    A. We didn't come up -- Sara Lee did not come up
 3    with the ideas. We gave them the directions. He came
 4    back to us with what he was proposing to use in that
 5    display area.
 6    Q. Can you tell me what you mean by: "We gave
 7    him the ideas"? Can you give me an example of the ideas
 8    that we are talking about?
 9    A. Again, the ideas were not really the ideas, but
10    what we gave him was: You must have a prominent showing
11    of our logo of our brand, of our messaging, and we wanted
12    it interactive. That's the direction that we gave him.
13    Q. You gave him the brand, the logo and the tag
14    lines. Was he then free to do whatever he chose to do
15    with those items?
16    A. He would have to come back and share with us
17    his ideas.
18    Q. And they would have to get the approval
19    eventually -- I take it -- of Sara Lee?
20    A. Correct.
21    Q. One of the proposals -- it looks like from
22    Mr. Kellogg -- was that he wanted a single tower be used
23    at one point at a display that was in the deck of things
24    that we were provided by Sara Lee. Do you ever recall
25    discussing with Mr. Kellogg the use of one tower as
```



Toll Free: 800.441.3376
Facsimile: 202.296.8652

ESQUIRE
an Alexander Gallo Company

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 49

1. A. Other than dates of execution, no.
2. Q. Whose responsibility was that to provide
3. information as to what was going to appear in the
4. contract?
5. A. I don't know.
6. Q. Eventually, though, there was a written
7. agreement prepared, correct?
8. A. Correct.
9. Q. Did you say that you have looked at it?
10. A. I glanced through it, but I'm not a lawyer.
11. So I would send it on to the lawyer.
12. Q. So when you glanced through it, who at that
13. time had prepared it, as far as you know?
14. A. I don't know.
15. Q. There were certain obligations, as you are
16. aware, I think you told us that Sara Lee had ISC
17. because there was a sponsorship agreement, correct?
18. A. Correct.
19. Q. Do you know if anyone had the responsibility
20. for making sure that what was required by ISC of Sara
21. Lee was followed or adhered to in the agreement between
22. Mr. Kellogg and Sara Lee?
23. MR. WHITE: Objection to the form of the
24. question.
25. THE WITNESS: Say that again.

### 50

1. MR. FIELSTRA: Would the court reporter please
2. read that back.
3. (Question read back).
4. A. As it relates to ISC?
5. Q. Let me rephrase that. It was very
6. complicated.
7. A. Thank you.
8. Q. There was an agreement between ISC and Sara
9. Lee, correct?
10. A. Correct.
11. Q. There was an agreement between Park Programs
12. through Mr. Kellogg and Sara Lee, correct?
13. A. Correct.
14. Q. Was anyone, as far as you know -- did anyone,
15. as far as you know, have the responsibility for making
16. sure the two contracts were consistent; that is, what
17. ISC required of Sara Lee was carried on through the
18. contract with Park Programs?
19. A. That I do not recall.
20. Q. Okay. You don't recall if anyone had that
21. responsibility?
22. A. Correct.
23. Q. When the relationship ended with Mr. Kellogg,
24. who actually advised him that he was done with Sara Lee?
25. A. Sara Lee's lawyer, Erica Dillon.

### 51

1. Q. We have seen some correspondence from Erica
2. Dillon to Mr. Kellogg asking for some items that needed
3. to be returned.
4. A. Uh-hum.
5. Q. One of them was the banner?
6. A. Uh-hum.
7. Q. Yes?
8. A. Yes.
9. Q. Do you know whether or not the banner was ever
10. returned to Sara Lee?
11. A. I do not know.
12. Q. Do you know if the mat was ever returned to
13. Sara Lee?
14. A. I don't know.
15. Q. Do you know if ever Sara Lee ever asked for
16. those towers?
17. A. No, because they weren't Sara Lee's property.
18. Q. Was the banner Sara Lee's property?
19. A. If it had a Ballpark brand on it, then yes.
20. Q. So the banner was Sara Lee's property?
21. A. The banner.
22. Q. You don't know if it was ever returned to Sara
23. Lee, correct?
24. A. Correct.
25. Q. We have been told in this litigation by Park

### 52

1. Programs through their attorney that the banner was
2. returned to Deb Sabo. Did she ever tell you that she
3. got the banner?
4. A. No.
5. MR. COLE: Objection to the form of the
6. question.
7. MR. FIELSTRA: That's all I have. Can we take
8. a few minutes?
9. MR. COLE: Sure.
10. (Recess taken).
11. CROSS-EXAMINATION
12. BY MS. NETTLES:
13. Q. Earlier in your testimony you were discussing
14. a meeting where I believe you and Travis Green and some
15. other Sara Lee folks were meeting with Brad Kellogg to
16. evaluate his capabilities?
17. A. He came in to pitch what he does.
18. Q. Were you evaluating his capabilities of
19. whether or not he could have an adequate display to
20. advertise and promote the Ballpark Franks brand?
21. A. Yes.
22. Q. In that meeting, did anybody from Sara Lee ask
23. him about his education for erecting 20-foot towers such
24. that it ended up being used at the Darlington race?
25. A. No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

81

1. A. Yes.
2. Q. But two towers, eventually, came up and that,
3. apparently, was approved by Sara Lee?
4. A. Yes.
5.     MS. NETTLES: Do you want to mark it?
6.     MR. FIELSTRA: These are marked. It has
7. already been marked. We are still on the record.
8.     MR. COLE: I couldn't find it in the exhibits.
9.     MR. FIELSTRA: I think 287 was marked at Jared
10. Cozza's deposition, I believe.
11.     MS. NETTLES: I meant marked in this
12. deposition.
13.     MR. FIELSTRA: I will do that. It's out --
14. I do not have the deck.
15.     MS. NETTLES: You can have it.
16.     MR. FIELSTRA: Thank you.
17.     (Defendants' Exhibit 5 marked).
18. BY MR. FIELSTRA:
19.     Q. I will show you what has been marked, but it
20. has been identified as Sara Lee document Bates 292.
21. This looks like another item from the deck. It looks
22. to be a Park Programs proposal.
23.     MR. COLE: Is it 292?
24.     MR. FIELSTRA: Yes.
25.     A. Yes.

82

1.     Q. In that proposal from Park Programs, once
2. again, we see that he is proposing one 20-foot tower,
3. the Ballpark banner on top of the tower. On both sides
4. of the tower, that was rejected by Sara Lee, correct?
5.     MR. COLE: Same objection. Objection to the
6. form. Excuse me.
7.     A. Yes.
8.     MR. FIELSTRA: I would ask this be marked as
9. Defendants' Exhibit 6.
10.     (Defendants' Exhibit 6 marked).
11.     Q. So, I take it, when these ideas were rejected,
12. Mr. Kellogg asked to come back with another idea,
13. correct?
14.     A. Correct.
15.     Q. You are saying that eventually he came back
16. with an idea intending to make the brand visible that
17. included two towers, which was approved. Is that fair?
18.     A. Yes.
19.     MR. FIELSTRA: All right. That's all I have.
20.     MR. COLE: Does anyone else have anything?
21.     MS. NETTLES: No.
22.     MR. COLE: I have just a couple of questions.
23.         RECROSS-EXAMINATION
24. BY MR. COLE:
25.     Q. Ms. Wesson, I just want to clarify one thing

83

1. that you said about uploading the artwork. Explain for
2. the record what you meant by that.
3.     A. Because we, Sara Lee, has certain standards
4. for the brand and the colors. In this case there are
5. certain vendors that we allow to have our artwork. There
6. are certain vendors that we allow to make changes to that
7. artwork. So RPI was one of them, as well as Spring Dot,
8. where they have access in and can make a change to our
9. artwork, if need be. And if somebody needs the Ballpark
10. logo, for whatever reason, including this case, Brad
11. would need the Ballpark logo for the mat, the banners,
12. the tents and things like that.
13.     So we had our vendor upload the logo to them.
14. That doesn't allow him to make a change, but he could use
15. it to produce the mat and produce the banner and produce
16. the tents.
17.     Q. A long time ago I think there was a question
18. by Mr. Fielstra and you used the word "rendering." I
19. think it was in connection with Ms. Sabo's approval of
20. the way the display was to look. I'm showing you Bates
21. 282, which is a black and white copy that has been
22. introduced in your deposition. This is Exhibit 2 to
23. the Sabo deposition. Is that the rendering that you
24. were talking about (indicating)?
25.     A. Yes.

84

1.     Q. I think you also said a while ago -- I just
2. want to clarify -- the ideas presented by Sara Lee to
3. Brad Kellogg for his consideration were from a marketing
4. standpoint and not from the execution of a display
5. standpoint?
6.     A. Correct.
7.     Q. That was his responsibility?
8.     A. Correct.
9.     MR. COLE: All right. Thank you.
10.     MR. FIELSTRA: Nothing further.
11.     How about you, Mack?
12.     MR. WHITE: No. I'm done.
13.     THE REPORTER: Do any counsel want a copy of
14. the transcript?
15.     MR. WHITE: Yes, please.
16.     MR. TYLER: Just send it to Mr. Marvel, my
17. co-counsel.
18.     THE REPORTER: Okay. Thank you, sir.
19.     MS. NETTLES: An E-trans, a regular and mini.
20.     MR. FIELSTRA: I just want a mini.
21.     THE REPORTER: In ten business days?
22.     MR. FIELSTRA: Yes. No rush.
23.     THE REPORTER: Okay. Thank you.
24.     Mr. Marvel, do you want a copy?
25.     MR. MARVEL: Yes. I want a copy and an



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com